UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTINA RUSSELL, an individual,

                              Plaintiff,

v.

COMCAST CORP., a foreign corporation,
Short Term Disability Plan and Long Term
Disability Plan sponsor for the Comcast Short
Term Disability Plan and Long Term
Disability Plans; et al.,

                              Defendants.

No.  C08-309Z

ORDER

        This matter comes before the Court on Plaintiff's motion for summary judgment,

docket no. 19, and Defendants' cross motion for summary judgment, docket no. 26.  The

Court has reviewed the briefs and records filed herein and, being fully advised, now enters

the following Order GRANTING Defendants' cross-motion for summary judgment,

DENYING Plaintiff's motion for summary judgment, and DENYING Plaintiff's request for

attorney's fees and costs.

# FACTS

Plaintiff Christina Russell (Russell) began work with Defendant Comcast Corporation (Comcast) as a Commercial Coordinator on January 19, 1999. CR 0017, 0144.[1] Included in Russell's benefits package with Comcast was Company-paid short-term disability (STD) coverage. CR 0239. The Summary Plan Description (SPD) explained that enrollment in STD coverage was automatic after 91 days of employment and became available to employees "who are actively at work and suffer a non-work related injury or illness for a period longer than seven calendar days." Id. For purposes of the STD plan, "disability is defined as being unable to perform your *own job*." Id.

To support a finding of short-term disability, a claimant had to submit the following information: "**clinical** medical data from your physician's office . . . includ[ing] your objective medical findings, physician's physical exam findings, the results of diagnostic testing, confirmation of surgical procedures, etc. Subjective complaints, must be supported by the clinical findings." CR 0301 (emphasis in original). The maximum duration of STD benefits was "26 weeks per calendar year." CR 0239. Comcast funded the STD plan, id., but delegated claims administration responsibilities to Defendant Broadspire Services Inc. (Broadspire). CR 0144, 0301.[2]

---

[1] Citations to "CR" indicate documents contained in the Administrative Record. These documents were submitted along with the Declaration of Michael Jacobson, docket no. 21, which was filed with Plaintiff's Motion for Summary Judgment, docket no. 19.
[2] Plaintiff also elected Long-Term Disability (LTD) coverage. CR 0002, 0286. LTD coverage "protect[s] [participants] from loss of income during an illness or injury that extends beyond 26 weeks." CR 0246. While Plaintiff asserts a cause of action for LTD benefits, Plaintiff never became eligible for such benefits because Broadspire denied her STD claim before she accrued the requisite 26 weeks. See CR 0171 (stating that Russell's STD claim was denied on 1/14/05 and that her start date for LTD benefits was 2/7/05). Therefore, the Court will not address other specific requirements of the LTD Plan.

On August 2, 2004, Russell stopped working because of a "major depressive disorder with psychotic symptomatology [sic]." CR 0079. Russell began receiving STD benefits on August 9, 2004. CR 0137. Dr. Kim Emory examined Russell on August 17, 2004, and indicated that Russell was very depressed, was suffering from panic attacks once or twice per week, had suicidal ideation, and heard voices and saw shapes in her room at night. CR 0079, 0153.

Dr. David Roys, a psychiatric specialist, examined Russell on September 21, 2004. CR 0079, 0156. Dr. Roys met with Russell fairly regularly over the next four months.[3] On Russell's initial visit, Dr. Roys described her as listless, "mildly depressed," and suffering from hallucinations and panic attacks that lasted "approximately 30 minutes" and occurred "10 times in the last two months." CR 0156. On October 20, 2004, Dr. Roys noted that Russell was agitated, listless, and suffering from middle insomnia and paranoia; Dr. Roys did not, however, check off that Russell was suffering from panic attacks. CR 0157.

On October 25, 2004, Dr. Barry Glassman independently reviewed Dr. Roys' assessment of Russell. CR 0079. Dr. Glassman confirmed that Russell was suffering from "paranoia and lability that would preclude [her] from performing the core elements of her own occupation," but that she would likely be ready to return to work at the next review. Id.

On December 8, 2004, Dr. Roys described Russell as pressured, loud, agitated, unable to spontaneously compose herself, and suffering from hallucinations. CR 0158. Dr. Roys

---

[3] See Dr. Roys' Behavioral Health Clinician Statements dated September 21, 2004 (CR 0156), October 20, 2004 (CR 0157), December 8, 2004 (CR 0158), January 5, 2005 (CR 0161), January 12, 2005 (CR 0170), January 21, 2005 (id.), and January 28, 2005 (id.).

once again noted that Russell was not suffering from panic attacks. Id. Dr. Glassman

performed another peer review on December 13, 2004, and listed Russell as "agitated,"

"irritable," and suffering from "hallucinatory phenomena." CR 0159. He recommended that

Russell be precluded "from performing the core elements of her own occupation from

12/13/04-1/13/05." Id.

On January 18, 2005, Broadspire reviewed Russell's records and denied the extension

of her STD benefits. CR 0165-66.[4] Broadspire's letter to Russell explained that, despite Dr.

Roys' authorization of benefits through January 13, 2005, the "data lacked examination

findings to support disability." CR 0165. Broadspire had not received information sufficient

"to support a functional impairment." Id. Thus, it "ha[d] no other recourse but to deny

[Russell's] request" for STD benefits. Id. Russell could appeal the determination to

Broadspire within 180 days. Id.[5] If appealed, the letter detailed additional medical

information that was necessary "to perfect [Russell's] claim," such as "information that

documents . . . the frequency, duration, and intensity, of your symptoms observed" and other

findings like "results of a formal mental status exam or performance based tests of

psychological functioning with standardized scores." Id.[6]

---

[4] Russell alleges that a social worker, Jen, made the initial recommendation to Broadspire to deny Russell's STD benefits. Pl.'s Reply & Response at 6 (docket no. 28). The Record demonstrates that a social worker by the name of Jen recommended that Russell's STD benefits be denied. CR 0109-11. There is no evidence to suggest, however, that either the initial or the final denial was premised solely on this recommendation.

[5] The SPD provided further explanation of the appeals process and confirmed that the "review will be conducted by the Claims Administrator or appropriate named fiduciary." CR 0281. Broadspire was the Claims Administrator. CR 0301; see also CR 0289 & 0293. The SPD also stated that "[a]ll decisions are final and binding unless determined to be arbitrary and capricious by a court of competent jurisdiction." CR 0282.

[6] The letter further explained that "[t]o support your disability you must include sufficient clinical data that is applicable to your claim for disability, such as, but not limited to (a) Office notes,

On January 28, 2005, Russell appealed the denial of her STD benefits. CR 0168. Russell submitted additional documents from Dr. Roys, including a letter dated January 28, 2005, and Progress notes dated January 12, January 21, and January 28, 2005. CR 0169-70. On January 12, 2005, Dr. Roys described Russell as "very irritable" and "moderately depressed." CR 0170. On January 21, 2005, he explained that Russell "had an episode while she was cleaning her bathroom of shaking and feeling weak" that Dr. Roys concluded "sounds more like a panic attack than a seizure." Id. On January 28, 2005, he described Russell as "very depressed" and suffering from "middle insomnia and severe fatigue." Id. The letter from Dr. Roys likewise explained that Russell "remains quite depressed and irritable" and "appears rather hostile." CR 0169. However, her "panic attacks have improved, and are happening rarely." Id. Dr. Roys ultimately concluded that Russell "still has sufficient depression to be disabled." CR 0170.

Broadspire referred Russell's file to Jim Knisley, RN. CR 0126. Knisley affirmed Broadspire's initial denial, concluding that the provider had failed to "substantiate any clinical examination findings in the areas of cognitive, emotional or behavioral spheres which would support that the [claimant] would be unable . . . to perform the core elements of her job." Id. Russell's file was then referred to a Physician Peer Reviewer, Dr. Elana Mendelssohn, PsyD, a specialist in clinical and neuropsychology. CR 0171-73. Dr. Mendelssohn's Peer Review, dated March 23, 2005, summarized Dr. Roys' reports, noting that "[i]t was [Dr. Roys'] opinion that the claimant was disabled due to depression."

_____

treatment notes (b) X-ray reports, diagnostic test results, lab work (c) Consultation reports, hospital notes." CR 0165-66.

CR 0172.  She indicated, however, that Dr. Roys' January 28 letter confirmed that Russell's "panic attacks have improved and rarely occur."  Id.

Dr. Mendelssohn did not interview or speak with Russell directly; however, she did engage Dr. Roys in a conversation "to clarify the claimant's mental status."  CR 0171-72. The two doctors discussed Dr. Roys' "opinion that claimant was unable to work due to negativity, irritability, and possible physical damage."  CR 0172.  Dr. Mendelssohn's Peer Review does not reflect any discussion between the doctors about Russell's panic attacks. See id.

Dr. Mendelssohn concluded that "the information does not support a functional impairment from 1/14/05 to 2/06/05."  Id.  While earlier "documentation indicated inability to work primarily due to panic attacks and hallucinations . . . , more recent documentation does not indicate the presence of these symptoms."  Id.  Additionally, there were no "reports of acts of violence or aggressive behaviors."  Id.  In sum, "the examination findings and behavioral observations fail to describe a psychological condition impacting the claimant's functioning to a degree to preclude her from performing her own occupation."  Id.

On April 1, 2005, the Broadspire Appeal Committee (Appeal Committee) denied Russell's appeal.  CR 0144-45.  After reviewing the documents submitted, the Appeal Committee reasoned that "there is a lack of current medical evidence (i.e. continued presence of panic attacks and hallucinations; examination findings and/or behavioral observations etc.) to substantiate significant impairments in your current functioning that would have prevented you from performing your job as a Commercial Coordinator."  CR 0144.  The denial was

effective as of the date of the initial denial, January 14, 2005.  Id.  The letter explained that

Russell had the right to bring a civil action under ERISA.  Id.  This action followed.

**DISCUSSION**

### A.    Standard of Review

A court reviews benefit denial claims under an ERISA plan *de novo* "unless the

benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits."  Firestone Tire Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

Where a plan grants discretionary authority, the court reviews the administrator's decision

for abuse of discretion.  Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d

863, 866 (9th Cir. 2008).  Where a plan administrator has discretion, a motion for summary

judgment merely provides the "conduit" for bringing the issue before the court, and the usual

tests of summary judgment do not apply.  Bendixen v. Standard Ins. Co., 185 F.3d 939, 942

(9th Cir. 1999).  It is the primary job of plan administrators—not the courts—to evaluate a

claimant's eligibility for benefits.  Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,

370 F.3d 869, 875 (9th Cir. 2004) (explaining that courts "cannot substitute [their] judgment

for the plan administrator's").

A court can "set aside the administrator's discretionary determination only when it is

arbitrary and capricious."  Id.  A determination is arbitrary and capricious only where it is

"clearly erroneous" and, thus, is not "grounded on *any* reasonable basis."  Id.  More

specifically, "[a]n ERISA administrator abuses its discretion only if it (1) renders a decision

without explanation, (2) construes provisions of the plan in a way that conflicts with the plain

language of the plan, or (3) relies on clearly erroneous findings of fact."  Boyd v. Bert

<u>Bell/Pete Rozelle NFL Players Retirement Plan</u>, 410 F.3d 1173, 1178 (9th Cir. 2005); <u>see also</u> <u>Bendixen</u>, 185 F.3d at 944 (holding that an administrator does not abuse his discretion if the decision was "based upon a reasonable interpretation of the plan's terms and was made in good faith") (citations omitted).

Moreover, ERISA administrators need not accord special weight to the opinions of a claimant's treating physician, nor may courts impose a "discrete burden of explanation [on plan administrators] when they credit reliable evidence that conflicts with a treating physician's evaluation." <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003). In sum, where there is relevant evidence in the administrative record that reasonable minds might accept as adequate to support a conclusion, even if it is possible to draw two inconsistent conclusions from the evidence, the administrator's decision must be allowed to control. <u>LaPrease v. Unum Life Ins. Co. of Am.</u>, 347 F. Supp. 2d 944, 954 (W.D. Wash. 2004) (Zilly, J.).

### 1. *Factoring in a Conflict of Interest*

Courts apply the abuse of discretion standard even if there are egregious conflicts of interest. <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 965 (9th Cir. 2006). Where a plan administrator has a conflict of interest, a court's review of the plan administrator's decision must be "informed by the nature, extent, and effect on the decision-making process of any conflict of interest." <u>Id.</u> at 967. In short, where there is evidence of a conflict of interest, courts must apply an "abuse of discretion review, tempered by skepticism commensurate with the plan administrator's conflict of interest." <u>Id.</u> at 959. The level of skepticism with which a court views a conflicted administrator's decision may be greater if a

structural conflict of interest is accompanied by evidence of malice, self-dealing, a

parsimonious claims-granting history, a failure to adequately investigate or ask the plaintiff

for necessary evidence, or a failure to credit a claimant's reliable evidence.  Id. at 968-69; see

also Beamish v. The Hartford/The Hartford Financial Servs. Group, Inc., 487 F. Supp. 2d

1196, 1202 (W.D. Wash. 2007) (Zilly, J.); Metropolitan Life Insurance Co. v. Glenn, --- U.S.

---, 128 S. Ct. 2343, 2351 (2008) (explaining that a conflict "should prove less important

(*perhaps to the vanishing point*) where the administrator has taken active steps to reduce

potential bias and to promote accuracy") (emphasis added).[7]

An inherent conflict most commonly "exists when a plan administrator . . . is also the

sole source of funding."  Abatie, 458 F.3d at 965 n.5 (citing Bruch, 489 U.S. at 105).  A

similar conflict results when "an insurer that acts as both the plan administrator and the

funding source for benefits operates under what may be termed a structural conflict of

interest."  Abatie, 458 F.3d at 965 (citing Tremain v. Bell Indus., Inc., 196 F.3d 970, 976 (9th

Cir. 1999)).

The Court may consider extrinsic evidence outside the administrative record "to

decide the nature, extent, and effect on the decision-making process of any conflict of

interest."  Abatie, 458 F.3d at 970.  The "decision on the merits, though, must rest on the

---

[7] The Supreme Court's recent holding in Metropolitan Life is consistent with the Ninth Circuit's
holding in Abatie. See Hoskins v. Bayer Corp. & Business Services Long Term Disability Plan, 564
F. Supp. 2d 1097, 1103 (N.D. Cal. 2008) (concluding that there was "no inconsistency between the
Ninth Circuit's holding in Abatie . . . and the Supreme Court's recent decision in Metropolitan
Life").  In Metropolitan Life, the Court reiterated that "when judges review the lawfulness of benefit
denials, they will often take account of several different considerations of which a conflict of interest
is one." 128 S. Ct. at 2351.  In addition to explaining when a conflict might reach the "vanishing
point," the Court explained that a conflict "should prove more important (perhaps of great
importance) where circumstances suggest a higher likelihood that it affected the benefits decision."
Id.

administrative record once the conflict (if any) has been established." Id. (citing Doe v. Travelers Ins. Co., 167 F.3d 53 (1st Cir. 1999)). This Court considered extrinsic evidence to determine the effect, if any, the conflict may have had on Defendants' decision-making process.[8]

### 2. Factoring in Procedural Irregularities

Much like a conflict of interest, "[a] procedural irregularity . . . is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." Abatie, 458 F.3d at 972. *De novo* review becomes appropriate only "[w]hen an administrator engages in *wholesale and flagrant* violations of the procedural requirements of ERISA." Id. at 971 (emphasis added). A minor procedural irregularity, on the other hand, will not change the standard of review from abuse of discretion to *de novo*. Id. (citing Gatti v. Reliance Standard Life Ins. Co., 415 F.3d 978, 985 (9th Cir. 2005)). Where an administrator engaged in an "ongoing, good faith exchange of information" with the claimant, courts give the "administrator's decision broad deference notwithstanding a minor irregularity." Abatie, 458 F.3d at 972 (citations omitted).

The Court may "take additional evidence when [procedural] irregularities have prevented full development of the administrative record" to effectively recreate what the administrative record should have included. Id. at 973; see also Bartholomew v. Unum Life Ins. Co., 579 F. Supp. 2d 1339, 1341 (W.D. Wash. 2008) (Pechman, J.) (ruling that extrinsic evidence only included "information which the [parties] *already* had in their possession" and

---

[8] Specifically, the Court considered the evidence that Russell provided in declarations filed with her Motion (docket no. 19), Reply & Response (docket no. 28), and Memorandum of Supplemental Authorities (docket no. 37).

did not require additional discovery). If reviewing under an abuse of discretion standard, the Court need only consider evidence that could have been a part of the record that the administrator reviewed to make its decision. <u>Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan</u>, 349 F.3d 1098, 1110 (9th Cir. 2003).

In sum, the issues before the Court are: (1) whether the Plan gave both Comcast and Broadspire discretionary authority and thus requires the Court to review under an abuse of discretion standard; (2) the weight that the Court should give Broadspire's and/or Comcast's conflicts of interest in conducting its abuse of discretion analysis; (3) the weight that the Court should give, if any, to Broadspire's procedural errors in conducting its abuse of discretion analysis; and (4) whether Broadspire abused its discretion when it denied Russell's STD benefits.

## B.    Abuse of Discretion Standard

The parties do not dispute that Comcast's Plan is an ERISA plan under 29 U.S.C. § 1002(1). The parties also agree that the plan granted discretionary authority to both Plan Administrator Comcast and Claims Administrator Broadspire. With respect to Comcast, the Plan also provided that Comcast reserved discretion over all eligibility decisions:

> The Plan Administrator [Comcast] has the *exclusive* right, power and *authority* in its *sole and absolute discretion* to (1) Construe and interpret the provisions of the plans, (2) Make factual determinations, (3) *Take all actions and decide all questions of eligibility for benefits*, (4) Determine the amount of such benefits, (5) Resolve issues arising in the administration, interpretation, and/or application of the plans, and (6) Correct any defects.

CR 0295 (emphasis added). This provision unambiguously vests discretion in Comcast. <u>See</u> <u>Abatie</u>, 458 F.3d at 963 (holding that "plan wording [that] grant[s] the power to interpret plan

terms and to make final benefits determinations . . . confers discretion on the plan administrator").

As a "Claims Administrator" under the Plan, Broadspire was authorized to "determine eligibility for benefits in accordance with official plan documents." CR 0295; see also CR 0301. This provision unambiguously vests discretion in Broadspire. See Abatie, 458 F.3d at 963 (citing Bruch, 489 U.S. at 115) (holding that a plan that grants an administrator the right to determine eligibility for benefits gives the administrator discretionary authority).[9] Consequently, the Court will review the administrators' decisions under an abuse of discretion standard.

/// 

///

///

## C.    Evaluating the Conflicts of Interest

### 1.    Comcast's Conflict of Interest

The parties agree that Comcast funded the STD plan. The SPD confirms that STD benefits are "*Company-paid*." CR 0239 (emphasis added). Both parties also agree that Comcast delegated to Broadspire authority to handle eligibility claims and appeals and that Broadspire made both the initial and final decisions with respect to Russell's claim. Pl.'s Reply & Response at 9 (docket no. 28); Defs' Mot. at 7 (docket no. 26); CR 0144-45, 0165-66.

[9] The SPD further confirms that Broadspire is entitled to deferential review, stating that "[a]ll [appeal] decisions are final and binding unless determined to be arbitrary and capricious by a court of competent jurisdiction." CR 0282.

Defendants argue that, as a result of this full delegation to Broadspire, Comcast cannot be considered "conflicted" because it did not make the STD eligibility decision. Yet, as the SPD makes clear, Comcast reserved "sole and *absolute discretion* to . . . take all actions and decide all questions of eligibility for benefits." CR 0295 (emphasis added). Thus, even though Comcast did not make the decision in the instant case, Comcast had reserved discretion to ultimately do so; therefore, Comcast must be considered conflicted with respect to the STD Plan. See <u>Abatie</u>, 458 F.3d at 965 n.5 (explaining that a conflict exists simply "when a plan administrator . . . is also the sole source of funding") (citing <u>Bruch</u>, 489 U.S. at 105).

Even though Comcast is conflicted with respect to the STD Plan, the Court will not afford the conflict significant weight. A court may weigh a conflict more heavily where the conflict informs the eligibility decision. <u>Abatie</u>, 458 F.3d at 967-68. However, a conflict of interest reaches the "vanishing point" where an administrator "has taken active steps to reduce potential bias and to promote accuracy." <u>Metropolitan Life</u>, 128 S. Ct. at 2351. In the instant case, Comcast played no role in the decision to deny Russell's STD benefits. Instead, Comcast delegated such responsibilities to Broadspire and, thus, Comcast took active steps to reduce bias by walling itself off from eligibility decisions. As a result, Comcast's conflict did not inform the decision-making process and the Court will view the claims decision with a low amount of skepticism.

### 2.     *Broadspire's Conflict of Interest*

Russell also asserts that Broadspire had a conflict of interest because it administered the STD Plan and insured the LTD Plan. Russell reasons that, because a claimant must

accrue 26 weeks of STD benefits prior to becoming eligible for LTD benefits, Broadspire

had a financial incentive to deny Russell's STD benefits just prior to 26 weeks so that

Broadspire would not be obligated to pay her LTD benefits. Pl.'s Reply & Response at 9-10

(docket no. 28). When an insurance company administers a plan and simultaneously profits

by denial of coverage, there is an inherent conflict of interest. <u>Lang v. Long-Term Disability</u>

<u>Plan of Sponsor Applied Remote Tech., Inc.</u>, 125 F.3d 794, 797 (9th Cir. 1997). Thus,

Russell argues that, even though Broadspire did not fund or insure the STD Plan, Broadspire

was conflicted because it insured the LTD Plan and so was positioned to ultimately profit

from denial of Russell's STD benefits. <u>See</u> <u>id.</u>

   The Court is not persuaded that Broadspire's role as the insurer of one plan informed

its decision as the administrator of another plan. Russell cites no case law to support her

position. Nor does Russell provide evidence that Broadspire acted with malice or self-

dealing, or that Broadspire had a parsimonious claims-granting history. In fact, Russell

admits numerous times that she is unsure whether to attribute Defendants' actions to

"inattention or bad faith." <u>See</u>, <u>e.g.</u>, Pl.'s Reply & Response at 18, 19, 23 (docket no. 28). A

conflict is given a high level of skepticism only if Russell proves that the administrator acted

with malice or self-dealing. <u>Abatie</u>, 458 F.3d at 968; <u>Metropolitan Life</u>, 128 S. Ct. at 2351.

Such evidence is not established on the Record or on the extrinsic evidence. Consequently,

even if the Court found that Broadspire was conflicted with respect to the STD Plan, the

Court would nonetheless view Broadspire's decision with a low level of skepticism, which is

the same amount of skepticism that the Court has found already applies to the instant claim

decision as a result of Comcast's conflict.

## D. Evaluating Broadspire's Procedural Irregularities

Russell contends that a number of procedural errors warrant admission of extrinsic evidence to effectively recreate what the Record should have been when Broadspire reviewed Russell's claim. Yet, Russell fails to establish that the Record was incomplete as a result of purported procedural errors.

First, Russell asserts that Defendants' initial denial letter did not comply with ERISA's procedural regulations, which require "[a] description of any additional material or information necessary for the claimant to perfect the claim." 29 C.F.R. § 2560.503(g)(iii). Yet, unlike <u>Booton v. Lockheed Medical Benefits Plan</u>, in which the court held that the administrator violated the ERISA regulations by sending denial letters that merely told the claimant to submit her claim to another carrier, 110 F.3d 1461, 1462 n.5 (9th Cir. 1997), Broadspire's initial denial letter included two paragraphs specifically drafted to provide Russell with the "medical information" necessary to "perfect" her claim. CR 0165-66. More specifically, the letter instructed Russell to submit the following: "behavioral observations which would include the frequency, duration, and intensity, of your symptoms observed [and] . . . the results of a formal mental status exam or performance based tests of psychological functioning with standardized scores." CR 0165.[10]

The instant case is also distinguishable from <u>Saffon</u>, 522 F.3d at 869-70. In <u>Saffon</u>, the court found an administrator's denial letter insufficient which, similar to the denial letters

---

[10] The letter further explained: "To support your disability you must include sufficient clinical data that is applicable to your claim for disability, such as, but not limited to (a) Office notes, treatment notes (b) X-ray reports, diagnostic test results, lab work (c) Consultation reports, hospital notes." CR 0165-66.

in the instant case, explained that denial was due to a lack of "objective medical information

to support [plaintiff's] inability to perform the duties of [plaintiff's] occupation." Id. at 870.

However, in Saffon, the treating doctor had responded to the initial request for objective data

by submitting Saffon's MRI results. Id. at 869. The court deemed the letter insufficient

because it failed to explain "why the [MRI] information Saffon has already provided is

insufficient for that purpose." Id. at 870. Here, although similar language was used in the

letters in the instant case (see CR 0165, 0144), Russell did not previously submit objective

evidence that Broadspire should have specifically addressed in its denial letters. Dr. Roys

had not provided any objective observations since his December 8, 2004, Progress Report.

CR 0158. The reports after December 8, 2004, contain only Russell's self-reported

symptoms. CR 0161, 0170. Thus, unlike the claimant in Saffon, Russell should have

understood that the reason the information she provided was insufficient was because, quite

simply, she had provided no recent objective findings.

Additionally, the Saffon court notes that the administrator's reference to a "Functional

Capacity Evaluation" in the final denial letter was "useful," but "came too late to do Saffon

any good." Saffon, 522 F.3d at 871. Broadspire included similar reference to "formal mental

status exam[s] or performance based tests of psychological functioning with standardized

scores." CR 0165. Unlike the administrator in Saffon, however, Broadspire appropriately

included this reference in its *initial* denial letter. Id. Thus, this information was not

conveyed to Russell too late to be of any use; rather, it was provided with sufficient time for

Russell to submit such objective findings on appeal. In sum, the Court does not find that

Defendants committed a procedural violation under 29 C.F.R. § 2560.503(g)(iii) that

rendered the Record incomplete.

Second, Russell contends that Defendants violated 29 C.F.R.§ 2560.503-1(g)(i) by

failing to provide her with "the specific reason or reasons for the adverse benefits

determination." Russell asserts that the letter failed to explain why "Dr. Roys' behavioral

observations and exam findings did not constitute clinical medical evidence of a behavioral

observation or exam finding." Pl.'s Mot. at 15 (docket no. 19). Yet, the letter explained that

the reason for denial of Russell's claim was due to "a lack of current medical evidence . . . to

substantiate significant impairments in your current functioning that would have prevented

you from performing your job." CR 0144. Thus, Broadspire's specific reason for denying

Russell's claim was a lack of evidence. Such rationale is sufficiently specific and does not

constitute a procedural violation of ERISA. See, e.g., LaPrease, 347 F. Supp. 2d at 948

(upholding an administrator's decision to deny benefits due to insufficient evidence to

support that claimant was disabled).

Third, Russell asserts that the final denial letter contained rationale that was

inconsistent with the initial denial letter. Pl.'s Mot. at 16-19 (docket no. 19). In Abatie, the

Ninth Circuit reversed and remanded the district court's ruling for "tack[ing] on a new reason

for denying benefits in a final decision, thereby precluding the plan participant from

responding to that rationale for denial at the administrative level." 458 F.3d at 974. Yet,

Abatie rests on a distinct set of facts and is distinguishable from the instant case. In Abatie,

the defendant originally denied the plaintiff's claim because there had been no waiver of

premium application. Id. In its final denial letter, however, the defendant "continued to rely

on that reason, but also added a second reason—that Plaintiff had provided insufficient

evidence to show" that the plaintiff was disabled.  Id.

Broadspire's final denial letter, on the other hand, did not add a wholly new reason for

denying Russell's claim.  Broadspire initially denied Russell's claim because the data

"lacked examination findings to support disability."  CR 0165-66.  In the final denial letter,

Broadspire maintained that Russell lacked medical evidence, but also added examples of the

type of evidence that Russell lacked.  Specifically, Broadspire noted that there was "a lack of

current medical evidence . . . i.e., continued presence of panic attacks and hallucinations."

CR 0144.  Thus, in contrast to Abatie, the letters in the instant case merely give examples of

the types of evidence that was lacking; the letters do not "tack on" entirely new reasons for

the denial.

The Court finds that these purported procedural errors, if any, are minor.  The

irregularities did not prevent full development of the administrative record.  Therefore, the

Court need not consider extrinsic evidence to effectively recreate what the administrative

record should have included at the time that Broadspire reviewed Russell's claim.  Abatie,

458 F.3d at 973.[11]  Likewise, because the procedural irregularities are minor, they do not

change the standard of review from an abuse of discretion to *de novo*.  Id. at 971.  Like the

---

[11] Even if the Court did consider extrinsic evidence, the supplemental evidence provided at *Apdx* CR 0407-69, is cumulative and provides no additional information in support of either party.  The documents containing evidence specific to Russell's case include: (1) Progress Notes from Dr. Roys dating from 2/4/05 to 6/12/07 (*Apdx* CR 0407-14); (2) Russell's earnings statement from 2/6/04 (*Apdx* CR 0426); and (3) Russell's Account Inquiry statements for her visits to Dr. Roys (*Apdx* CR 0412-30).  Dr. Roys' Progress Notes were cumulative of notes contained throughout the Record, describing Russell as mildly depressed, irritable, and hearing voices and seeing things.  *Apdx* CR 0407.  The financial documents merely show the cost of Russell's doctor visits and benefits. *Apdx* CR 0426-30.

conflicts of interest, however, the Court will consider these minor procedural irregularities as factors when deciding whether Defendants abused their discretion. Id. at 974; see also Carder-Cowin v. Unum Life Ins. Co. of Am., 560 F. Supp. 2d 1006, 1016 (W.D. Wash. 2008) (Lasnik, C.J.).

**E.     Defendants' Exercise of Discretion**

Even tempered by a low degree of skepticism, Broadspire did not abuse its discretion by denying Russell's STD claim.  The Record contained medical records and assessments that both supported and refuted Russell's disability.  Even though reasonable minds may have been able to draw two inconsistent conclusions from the evidence, as administrator, Broadspire's decision controls. LaPrease, 347 F. Supp. at 954.

First, Russell asserts that Broadspire abused its discretion by rendering its denial decision without explanation. Boyd, 410 F.3d at 1178.  Yet, as the Court held in LaPrease, 347 F. Supp. 2d at 954, a plan administrator who cites to a "lack of evidence" as justification for a benefit denial has not, *without more*, abused his discretion.  The same is true here.  It was not unreasonable for Broadspire to justify the denial due to "a lack of current medical evidence" of panic attacks and hallucinations when the Record, notably Dr. Roys' Progress Notes, supports that Russell's panic attacks were improving.  CR 0169.

Second, Russell contends that Broadspire construed provisions of the plan in a way that conflicted with the plain language of the plan. Boyd, 410 F.3d at 1178.  Yet, Russell fails to articulate how Broadspire did anything *but* adhere to the standards set forth in the plan.  Broadspire's Process Overview Sheet states that it "must receive **clinical medical** data from your physician's office . . . [which] include[s] your objective medical findings,

physician's physical exam findings, the results of diagnostic testing, confirmation of surgical

procedures, etc." CR 0301 (emphasis in original).  Most importantly, *"[s]ubjective*

*complaints, must be supported by the clinical findings.*"  (Id.) (emphasis added).  Broadspire

was following this very standard when it denied Russell's claim for failing to "substantiate

significant impairments" with "current medical evidence."  Compare CR 0144 with CR 0301.

Thus, Russell fails to demonstrate that Broadspire abused its discretion by construing plan

provisions in a way that conflicted with the plan language.

Third, Russell asserts that Broadspire abused its discretion because it relied solely on

Dr. Mendelssohn and failed to give proper weight to Russell's treating physician, Dr. Roys.[12]

Russell does not suggest that Dr. Mendelssohn was biased or unqualified.  Therefore,

Broadspire could reasonably rely on Dr. Mendelssohn's assessment to make its final

eligibility determination.  A plan administrator is not required to give special consideration to

the opinions of a treating physician over those of a reviewing physician.  Nord, 538 U.S. at

834.  And, while a decision to deny benefits cannot be arbitrary, the administrator need only

provide "a reasonable basis for concluding that the medical condition was not disabling."

---

[12] In her Reply & Response (docket no. 28), Russell makes a new argument that Broadspire relied on the opinion of a social worker, Jen, in deciding to deny Russell's claim. Pl.'s Reply & Response at 6 (docket no. 28); CR 0109-11. This argument misses the mark. The Record suggests that Jen's recommendation may have been used as a basis for the initial denial of Russell's STD benefits on January 18, 2005. CR 0109-11. Yet, the instant action is an appeal of the Appeal Committee's final denial of Russell's STD benefits on April 1, 2005. The very terms of the plan confirm that, "[w]hen reviewing an appealed claim, *no regard will be given to the initial denial*." CR 0281 (emphasis added). Thus, Russell's allegation that Broadspire relied on Jen's recommendation for the initial denial is irrelevant to the instant appeal. Moreover, even if the Appeal Committee considered Jen's assessment in its final decision to deny benefits, the Record clearly reflects that the Appeal Committee also considered the evaluations of peer reviewers, treating physicians, and nurses, and that its decision was the result of weighing all such evaluations. In sum, Russell's contention that the Appeal Committee improperly relied solely on Jen's assessment is unsubstantiated by the Record.

<u>Jordan</u>, 370 F.3d at 880. A single medical opinion may constitute substantial evidence upon which a plan administrator may rely in adjudicating a claim. <u>Boyd</u>, 410 F.3d at 1179.

After reviewing Dr. Roys' assessments and notes and even speaking to Dr. Roys directly to clarify Russell's mental status, Dr. Mendelssohn had a reasonable basis for concluding that Russell was not disabled. CR 0172. Dr. Mendelssohn based her conclusion on two factors. First, although documentation indicated that Russell was unable to work because of panic attacks and hallucinations, such conditions were not indicated in recent documentation. CR 0172. This conclusion is reasonably based on Dr. Roys' January 28 letter, which noted that Russell's "panic attacks have improved and rarely occur." CR 0169, 0171-72. Second, Dr. Mendelssohn explained that, although Dr. Roys felt Russell was unable to work "due to irritability and possible harm to others," documentation did not indicate that Russell was homicidal or acted violently or aggressively toward others. CR 0172. Such a conclusion is also reasonably based on the Record, which contains no reference to homicidal, violent, or aggressive tendencies.

Finally, Russell cites <u>Hackett v. Xerox Corp. Long-Term Disability Income Plan</u>, 315 F.3d 771 (7th Cir. 2003), to assert that Broadspire abused its discretion by failing to articulate in its final denial letter the reasons for relying on one doctor's assessment over another's. Yet, <u>Hackett</u> cannot be read so expansively. In <u>Hackett</u>, neither the administrator nor the reviewing doctor explained their conclusions for rejecting other treating doctors' assessments. 315 F.3d at 775. The court explained that, had the doctor "referenced the previous opinions and explained his deviation from them," it could have "assume[d] that any decision by the administrator took these factors into consideration" and was not arbitrary. <u>Id.</u>

Alternatively, had the administrator "provided a non-arbitrary explanation for their decision to credit [the doctor's] opinion over those of the other doctors," it could have also found that the administrator acted within its discretion. Id. at 775 n.3. Thus, Hackett requires that either the claims administrator or the doctor must explain why they have rejected other doctors' assessments. Id. at 775. It does not, as Russell asserts, require that *both* parties must provide such explanations. As described previously, Dr. Mendelssohn explained why she rejected Dr. Roys' conclusions. Dr. Mendelssohn's reasoning "shows that [she] weighed the evidence for and against" Dr. Roys' assessment and, although not explicitly cited in the final letter, the Court will "assume that any decision by the administrator took these factors into consideration." Id.

Thus, although there is evidence in the Record before Broadspire that supports Russell's claim of disability, there is also "relevant evidence in the administrative record that reasonable minds might accept as adequate to support" a finding of no disability. LaPrease, 347 F. Supp. 2d at 954. Broadspire reasonably relied on the opinions of its reviewing physician, communicated fully with Russell as to how she must perfect her claim, and reasonably construed the terms of the Plan. Consequently, the Court holds that Broadspire did not abuse its discretion by denying Russell's claim for STD benefits.

**F.     Award of Attorney's Fees and Costs**

Russell also requests a reasonable attorney's fee and costs. Under 29 U.S.C. § 1132(g), "the court within its discretion may allow a reasonable attorney's fee and costs of action to either party." Courts construe this section as allowing for the recovery of attorney's fees and costs incurred "regardless of the outcome." Oster v. Barco of Cal. Employees'

<u>Retirement Plan</u>, 869 F.2d 1215, 1221 (9th Cir. 1988).  Thus, this Court must consider the issue of attorney's fees regardless of whether Russell's motion is granted or denied.

In exercising discretion, the Court considers the following criteria: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative legal merits of the parties' positions.  <u>Oster</u>, 869 F.2d at 1222; <u>Watkins v. Westinghouse Hanford Co.</u>, 12 F.3d 1517, 1528-29 (9th Cir. 1993).  The Court, having considered these factors, accordingly denies Plaintiff's request for attorney's fees and costs.

**CONCLUSION**

Because Defendants did not arbitrarily and capriciously deny Russell's claim for STD benefits, the Court GRANTS Defendants' cross-motion for summary judgment, docket no. 26, and DENIES Plaintiff's motion for summary judgment, docket no. 19.  The Court also DENIES Plaintiff's request for attorney's fees and costs.

IT IS SO ORDERED.

DATED this 10th day of March, 2009.

Thomas S. Zilly
United States District Judge